UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JAMES AND NATASHA THREATT,      )
JANET MILLER,                   )
                                )
    Plaintiffs,               )
                                )
  v.                            )        CIVIL NO.   1:05cv117
                                )
CRF FIRST CHOICE, INC.,         )
                                )
    Defendant.                )

OPINION AND ORDER

This matter is before the court on a "Motion to Decertify Collective Action", filed by the

defendant, CRF First Choice, Inc.  ("CRF"), on March 27, 2006.  The plaintiffs filed their

response on May 16, 2006, to which CRF replied on June 4, 2006.

For the following reasons, the motion to decertify will be granted.

Discussion

The named plaintiffs, James and Natasha Threatt, and Janet Miller, and members of this

collective action who have opted in by filing consents[1], were formerly employed as "12-7 Direct

Care Staff" at homes operated by CRF.  The plaintiffs allege that CRF violated the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., by failing to properly pay them for overtime.

On August 31, 2005, this court adopted the Report and Recommendation of Magistrate

---

[1]  The FLSA provides for an action "by any one or more employees for and on behalf of
himself or themselves and other employees similarly situated."  29 U.S.C. § 216(b).  When an
employee's suit is on behalf of "other employees similarly situated", it is known as a "collective"
or "representative" action.  Harkins v.  Riverboat Servs., Inc., 385 F.3d 1099, 1101 (7th Cir.
2004).  A collective action is different from the class action procedure set forth in Federal Rule
of Civil Procedure 23; for instance, potential plaintiffs can only join a collective action by
"opting in," whereas a class action will include any potential plaintiff who fails to "opt out."  Id.
(citing Fed.  R.  Civ.  P.  23).

Judge Cosbey on the issue of certification of the FLSA collective action.  This court certified this

case as a collective action composed of "the 12-7 Direct Care Staff employed in CRF's Fort

Wayne group homes during the time period beginning April 1, 2002, and ending December 31,

2003."[2]   In its brief in opposition to certification, CRF argues that collective action certification

was inappropriate because its primary defense is that the plaintiffs were exempt from overtime

pay under the FLSA's companionship services exemption, which it claims will require layers of

highly individualized, fact-specific discovery and analysis to determine whether each plaintiff

was exempt.  The court found that given the plaintiffs' modest burden at the notice stage of

certification, CRF did not provide enough evidence to support its theory in order to defeat the

plaintiffs' motion for certification.  The bar date set by the court for individuals to opt-into the

collective action has now passed, and fifty-seven opt-in plaintiffs have joined the three named-

plaintiffs in this action.

　　　　Since the passage of the bar date, CRF has engaged in limited discovery from the

plaintiffs, aimed at obtaining the additional evidence the court called for to demonstrate that

layers of differences exist between the plaintiffs, which may have an effect on whether or not

each plaintiff will be exempt under the companionship services exemption.  CRF now argues

that this limited discovery has illuminated such evidence, indicating that if this case continues as

a collective action the parties will be required to engage in additional highly individualized

---

[2]  CRF maintains that reference to its former operations in Fort Wayne as "group homes" is factually inaccurate and cause for confusion.  CRF states that it provided services at "Medicaid-Waiver Homes", as opposed to "Group Homes" at which former defendant Residential CRF, Inc.  provided services.  CRF points out that Indiana State regulations that govern CRF's operations suggest, if not require, that services be provided "in the individual's own home."  460 Ind.  Admin.Code 6-3-46 (2005).

discovery and the court will ultimately have to engage in highly individualized, fact-specific analysis to determine whether each plaintiff is exempt.  According to CRF, because the plaintiffs have disparate factual and employment settings which will require CRF's affirmative defense to be individually applied to each plaintiff, the FLSA collective action should be decertified.

The following background facts are pertinent to the present motion.  CRF employed each of the plaintiffs as 12-7 Direct Care Staff during the period of time between April 1, 2002 and December 31, 2003. CRF states that during that time, it was in the business of providing residential care and companionship services to mentally infirm individuals (referred to as "consumers") within consumers' homes in Fort Wayne, Indiana.  Direct Care Staff provided day-to-day, hands-on care and services to CRF's consumers in their homes.

The normal work schedule for Direct Care Staff was to work twelve hours a day for seven straight calendar days, a total of eighty-four hours, and then to be off of work for seven straight calendar days.  The plaintiffs were paid on an hourly basis, bi-weekly.  CRF paid the plaintiffs at their regular rate for eighty of the eighty-four hours normally worked, and overtime for four of those hours, as well as overtime for any additional hours worked in either workweek of the pay period.  In or around late June 2003, CRF adopted its policy regarding the job description of 12-7 Direct Care Staff, indicating that CRF utilized a workweek for 12-7 Direct Care Staff that ran from Thursday until the following Thursday.[3]

_____

[3]  CRF maintains that, at all times, all plaintiffs were exempt from the overtime requirements of the FLSA, but that even if they were not exempt, the plaintiffs were still appropriately paid overtime in accordance with the FLSA.  The Thursday to Thursday workweek CRF elected demonstrates how CRF paid the plaintiffs, at least during the period between late June 2003, and December 31, 2003.  The plaintiffs worked eighty-four hours in a calendar week, but those hours were split across two FLSA workweeks at noon on Thursdays, leaving forty hours in one workweek and forty-four hours in the second workweek.  Thus, the plaintiff were

The nature of the services that plaintiffs provided to CRF consumers is described by state regulation, CRF's job description, and has been further described by the plaintiffs.  CRF refers to the homes in which it provides services as "Medicaid-Waiver Homes" because CRF receives compensation for some of those services from the Indiana State Medicaid program, which, in part, requires CRF to comply with certain state regulations.  Those regulations define the services provided by CRF as, "services that are designed to ensure the health, safety, and welfare of an individual, and assist in the acquisition, improvement, and retention of skills necessary for the individual to live successfully in the individual's own home."  460 Ind.  Admin.  Code 6-3-46 (2005).

CRF states that the CRF job description for Direct Care Staff also accurately describes the duties of the position.  The job description delineates that part of Direct Care Staff's responsibility is to aid and assist in training situations, including: cleaning of all types; food preparation; activities; and personal hygiene.  CRF further states that the named plaintiffs and some collective action members have been deposed and provided even more detailed insight into their job duties as Direct Care Staff, as detailed below.

Direct Care Staff were with CRF consumers all day and night to assist the consumers in all aspects of their daily life including, but not limited to: waking consumers up in the morning; helping them bathe and with other personal hygiene; getting them ready for work if they had a job outside of the home; preparing meals; eating with them; driving them to work or other activities and doctor's appointments; participating in educational and recreational activities and exercises with them; taking them for walks and on outings; cleaning up after all meals and

paid four hours of overtime, and overtime for each additional hour worked.

activities; assisting with the general cleaning and upkeep of the home; doing laundry; going grocery and clothing shopping; taking them to doctor's appointments; doing banking; passing medications; playing games or doing puzzles; watching television; reading books to them; preparing them for bed; waking them during the night to use the restroom; monitoring the consumers and documenting their progress and activities, and even just hanging out.  Direct Care Staff were the consumers' primary connection to the world outside of their homes.

CRF states that all Direct Care Staff work was related to the care and habilitation of the consumers, and there were not any tasks of the job that did not relate to the individual care of the consumers.  Generally, Direct Care Staffs' job was to do things with the consumers.  Almost everything that Direct Care Staff did was with the consumers if the consumers were able to assist or participate.  Direct Care Staff's job was to assist the consumers in all aspects of daily living, doing things with them and teaching them how to do things.

Nonetheless, according to CRF, the consumers mostly did whatever they wanted to, whenever they wanted to, so long as it was not dangerous.  The consumers had care plans or treatment plans which provided schedules of activities, goals and objectives for Direct Care Staff to work towards with them.  Those care plans were created with input regarding the likes and dislikes of the consumers as well as significant input from the consumers' guardians (parents or other legally appointed individuals) and state case managers.  Regardless of the care plans, it was still the consumers' choice as to whether or not they would do what was on the care plan for any particular day.  Moreover, Direct Care Staff would never force the consumers to do something they did not want to do.  Also, if the consumers wanted to be alone they could be.  Similarly, if they wanted the Direct Care Staff to do something with them, then the Direct Care Staff had no

choice but to do so.

CRF provided services to consumers within their individual homes or residences. Whenever new consumers came to CRF, CRF worked with the consumers, their guardians and state case managers to locate homes which met the particular consumers' needs, and if need be, other compatible consumers to live with the consumer. Different numbers of consumers lived in each home and the homes varied in size. Some homes had only one consumer living there. Other homes had two consumers living together. No more than three consumers lived together in any of the homes at which CRF provided services. With rare exception, there were no offices or other rooms set aside in the consumers' homes for CRF's use.

Neither the consumers themselves nor CRF owned the homes in which CRF provided services in Fort Wayne. Rather the homes were leased by third party landlords, who were not employed by CRF. Consumers paid rent to live in the homes. Different lease arrangements governed each home, as follows: in some instances, consumers or their guardians signed the lease to the home; in other instances the consumers' names appeared on the lease, but no one signed the lease; in other instances the consumers' name appeared on the lease, but CRF signed the lease; and in yet other instances CRF appeared on the lease as the tenant.

Regardless of the particular lease arrangement governing any particular home, the consumers and their guardians retained much control over the homes. The consumers owned the furniture in their homes. The consumers also received personal mail at the homes. The home was considered the consumers' home and everything done therein was to protect the consumers' needs. In fact, CRF had rules for Direct Care Staff including that they at all time respect the consumers, their belongings, and the consumers' homes. The consumers' money was also used

to pay for everything they purchased and did (i.e. groceries, clothes and various activities), and the Direct Care Staff could not use consumers' money for any other purposes.  The consumers' guardians could visit whenever they wanted, and even take the consumers out of the home whenever they wanted (provided they filled out some simple paperwork).  Similarly, the consumers could have other visitors whenever they wanted.  More importantly, a consumer or his/her guardian could have a particular staff member removed from their home if the consumer or guardian so desired.  CRF points out that the consumers and their guardians exercised so much control over their homes that in some instances when a consumer no longer desired to have CRF provide services to them, CRF removed itself form any connection to the home and the consumer continued to live at the home without CRF's services, often with another entity providing similar services.

According to CRF, at least five factors contributed to significant differences in the actual duties that any two plaintiffs performed or the actual services they provided.  CRF argues that given the general nature of the duties of Direct Care Staff, described above, these five factors, which are delineated and described below, can result in wide disparity between the types of services that any two plaintiffs provided to consumers on a regular basis, or even day-by-day.

First, consumers had varying degrees of mental challenge.  The duties or services that any particular plaintiff performed with or for the consumers they served varied depending upon the degree of mental challenge of the consumer.  Some consumers were very capable and able to participate in doing most things with their Direct Care Staff, while others were not very capable and most things had to be done for them.  Some consumers had jobs, but other consumers did not.  Some consumers were non-verbal.  Other consumers could barely do anything at all.

Similar to and compounding the first factor, Direct Care Staff duties also differed depending on the number of consumers living in a particular home. As discussed above, different homes had different numbers of consumers, varying from one to three, which has a natural impact on the amount of and division of duties within the home.

Third, different plaintiffs worked on different shifts, day shift or night shift, and some may have worked both shifts at various times. The duties of Direct Care Staff were different on the day shift and the night shift. On the night shift, since the consumers were typically asleep for much of the time there was more cleaning, laundry, documentation, and simple monitoring of consumers, and typically less interaction with the consumers than during the day shift. However, the night shift duties varied depending on the sleep habits or desires of the consumers on any particular day, because the consumers chose when they would go to sleep and when they would stay up and want to do other things -- sometimes even staying up all night and limiting the time the Direct Care Staff could spend tending to other duties. CRF points out that the plaintiffs' estimates of the amount of time they might have spent cleaning without the consumers on particular shifts also varies widely.

Fourth, the services performed by particular plaintiffs would vary depending on if they worked with a co-worker who could share the shift duties and how the co-workers chose to divide the duties. Typically, there would be two Direct Care Staff working the day shift and one working the night shift. Whenever Direct Care Staff worked with co-workers, duties would vary in each home based upon the particular co-workers' likes and dislikes. For example, some co-workers preferred to spend more of their time cleaning and doing other tasks without the consumers, whereas others preferred to spend more of their time interacting with the consumers.

8

Different Direct Care Staff would break up the daily tasks on a daily basis with the person they worked with, often based upon each others' likes and dislikes, which could result in each of them doing more or less of particular types of duties.

The fifth and final factor resulting in differences in the duties between particular plaintiffs is the size of the home at which services were provided. Not only did different homes have different numbers of consumers, but the homes also differed in physical size. In particular, some homes had significantly larger areas to take care of than others, such as basements or lofts. The duties of particular Direct Care Staff differed depending on the size of the home, primarily resulting in different percentages of time required for cleaning different homes.

CRF argues that given the five factors discussed above, the actual number of consumers each plaintiff provided services to, the number of co-workers each plaintiff worked with, and the number of homes in which each plaintiff provided services are particularly important. Therefore, CRF has obtained limited discovery responses from each of the named plaintiffs and opt-in plaintiffs with regard to these matters. CRF has provided the court with its Exhibit A, which indicates that the number of consumers each plaintiff provided services to ranges from two to twenty-one; the number of co-workers each plaintiff worked with ranges from two to twenty-seven; and the number of homes each plaintiff provided services at ranges from one to eleven.

CRF maintains that the consequence of all of these various factors resulting in differences in the amounts and types of actual services performed by the plaintiffs is that highly individualized, fact-specific discovery and analysis will be required in this action, requiring the decertification of the collective action.

Certification of a collective action typically involves a two-stage process, which the

parties have both advocated applies in this case.  The first step under this process was the subject

of this court's earlier ruling.  Under that first step, a plaintiff "must only make a 'threshold

showing' that she is 'similarly situated' to the employees she wishes to represent."  <u>Reich v.</u>

<u>Homier Distributing Co.</u>, 362 F.  Supp.  2d 1009, 1012 (N.D. Ind.  2005).

     The present motion to decertify represents the second step where the burden is raised.

"At the second step, after the parties have engaged in discovery and the defendant has moved to

deny certification, the court's inquiry is more stringent."  <u>Mielke v.  Laidlaw Transit, Inc.</u>, 313 F.

Supp.2d 759, 762 (N.D. Ill.  2004).  Under this more stringent inquiry courts generally consider

three factors: (1) whether plaintiffs share similar or disparate factual and employment settings;

(2) whether the various affirmative defenses available to the defendant would have to be

individually applied to each plaintiff; and (3) fairness and procedural concerns.  <u>Id</u>.

     CRF argues that this collective action should be decertified because the plaintiffs share

disparate factual and employment settings and CRF's primary affirmative defense will require

layers of highly individualized, fact-specific discovery and analysis.  This basis for

decertification was recently set fort by this court in <u>Reich v.  Homier Distributing Company,</u>

<u>Inc.</u>, 362 F.  Supp.2d 1009, (N.D. Ind.  2005).  In <u>Reich</u>, the plaintiff, a former "sales partner" of

the employee, brought suit against the employer for allegedly failing to pay her overtime and she

attempted to proceed on behalf of herself and other sales partners similarly situated to her.  <u>Id</u>.  at

1010.  On plaintiff's Motion to Approve Collective Action Notice, the employer argued that a

class-wide determination on liability would be impossible because its defense would be based

upon the argument that the sales partners were exempt under the FLSA's "loader exemption",

which required individual discovery and analysis for each sales partner.  <u>Id</u>.  at 1013.

This court denied the plaintiff's motion because the application of the loader exemption was dependent on each individual employee's specific duties, and because the individual discovery required to ascertain those duties would destroy "the economy of scale envisioned by the FLSA collective action procedure." Id. at 1015. Central to this court's rationale was that the exemption called for "a highly individualized, fact-specific inquiry" necessitating extensive discovery regarding several factors. Id. at 1013.

CRF argues that, similar to the employer in Reich, CRF's primary defense is that plaintiffs are exempt from the FLSA's overtime requirements under the FLSA's companionship services exemption. 29 U.S.C. § 213(a)(15); 29 C.F.R. § 552.6. The FLSA's companionship services exemption provides in relevant part, as follows:

> The provisions of [section] . . . 207 [overtime requirements] shall
> not apply with respect to -- . . .
> (15) . . . any employee employed in domestic services employment
> to provide companionship services for individuals who (because of
> age or infirmity) are unable to care for themselves (as such terms
> are defined and delimited by regulations of the Secretary [of
> Labor]); . . .

29 U.S.C. § 213(a)(15)(emphasis added). The Department of Labor ("DOL") has issued regulations which further define two of the key terms of the companionship services exemption: "domestic services employment" (29 C.F.R. 552.3); and "companionship services" (29 C.F.R. 552.6). Case law has also developed to delineate factors used to apply the companionship services exemptions. The result has been the development of two very fact-specific inquiries or elements that are required to determine whether any particular employee is exempt under the companionship services exemption: (1) whether the services were provided in a private home; and (2) whether incidental general household work the employee performed did not exceed

twenty percent of the total weekly hours worked.[4]  CRF argues that both elements of the

companionship services exemption are satisfied for each of the plaintiffs, but that because each

of those elements requires a highly individualized, fact-sensitive inquiry, and many differences

across those factors exist pertaining to each plaintiff, decertification is appropriate.

First, DOL regulations have limited domestic services employment to services performed

in a "private home."  The regulation provides in relevant part:

> As used in [29 U.S.C. § 213(a)(15)], the term domestic service
> employment refers to services of a household nature performed by
> an employee in or about <u>a private home</u> of the person whom he or
> she is employed . . .

29 C.F.R. § 552.3 (emphasis added).  The definition of domestic service employment, including

what constitutes a private home, is further explained in 29 C.F.R. § 552.101, which provides:

> (a) The definition of domestic service employment contained in §
> 552.3 is derived from the regulations issued under the Social
> Security Act (20 C.F.R. 404.1057) and from "the generally
> accepted meaning" of the term.  Accordingly, the term includes
> persons who are frequently referred to as "private household
> workers."  See S.Rep.  93-690, p.  20.  <u>The domestic service must
> be performed in or about the private home of the employer whether
> that home is a fixed place of abode or a temporary dwelling</u> as in
> the case of an individual or family traveling on vacation.  <u>A
> separate and distinct dwelling maintained by an individual or a
> family in an apartment house, condominium or hotel may
> constitute a private home.</u>
>
> (b) Employees employed in dwelling places which are primarily
> rooming or boarding houses are not considered domestic services
> employees.  The places where they work are not private homes but

---

[4]  The DOL recently confirmed these two elements of the companionship services
exemption stating, "the test of the FLSA makes the applicability of the companionship
exemption dependent upon the nature of an employee's activities and the place of their
performance."  <u>Wage & Hour Advisory Memo.  No.  2005-1</u>, p.  1 (12/1/05)(discussing that
companionship services exemption applies to third party employers).

commercial or business establishments.

29 C.F.R. § 552.101 (emphasis added).

Case law has also developed to further describe how to determine whether services were provided in a private home for purposes of the companionship services exemption.   In Welding v. Bios Corporation, 353 F.3d 1214 (10th Cir.  2004), the court held that whether companionship services are provided in a private home is a fact-specific analysis which must be made on a case-by-case basis, upon evaluation of the specific living unit of the person receiving the services.  Id. at 1218.  The Bios court reversed a lower court decision that attempted to make a blanket analysis of all the relevant living units in that case, as a whole, rather than evaluating each of them individually.  Id.  at 1218-19.

The Bios court also set forth a six factor analysis to consider in determining whether a living unit was a private home, concluding that the key inquiries are: (1) " who has ultimate management control of the living unit and whether the unit is maintained primarily to facilitate the provision of assistive services."  Id.  at 1219; (2) ownership of the living unit, or if not owned by the provider or client, who leases the unit (Id); (3) who manages and maintains the residence, providing the essential things that the client needs to live there, such as paying the rent, utilities, providing clean linens and clothes, and providing food (Id.  at 1219-20); (4) whether the client would be allowed to live in the unit if the client were not contracting with the provider for services (Id.  at 1220); (5) the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit (including government subsidies) (Id.); and (6) whether the service provider uses any part of the residence for the provider's own business purposes (noting however that a service provider's use of an area to maintain items specific to

13

the client's care would not weigh against it being a private home)(Id.).  The Court also instructed

that in this fact-specific analysis, "no single factor is dispositive."  Id.  at 1218 (citation omitted).

CRF maintains that all of its Fort Wayne homes were private homes, and that the same is

suggested by the regulations governing CRF's Medicaid-Waiver operations which suggest the

services are to be provided "in the individual's own home."  460 Ind.Admin.Code § 460-6-3-46.

Additionally, CRF maintains that there are significant similarities between the homes in which it

provided services, such that each of them will be found to be private homes under the Bios

factors.  However, CRF argues that whether all or any of the homes are in fact "private homes"

is not a matter to be determined at this stage.  CRF insists that the more important inquiry is

whether those determinations are appropriate to be undertaken in a collective action.  CRF

argues that two important things should be gleaned from the Bios case, which indicate

decertification of the collective action is appropriate.  First, a fact-specific inquiry regarding each

home, or living unit, is required to apply the companionship services exemption.  Second, the six

factor analysis required indicates that differences in the homes where particular plaintiffs

provided services will necessitate different analyses in the present case.

Bios explicitly held that the determination of whether a living unit is a private home for

purposes of applying the companionship services exemption is a fact-specific inquiry that must

be evaluated for each specific living unit.  Id.  at 1218.  CRF argues that this necessity alone

gives the court sufficient grounds to decertify the collective action.  CRF points out that in the

present case, different plaintiffs were assigned to different homes to work their normal schedule.

Moreover, each plaintiff has provided services in anywhere between two and eleven different

homes.  Thus, in order for this court to apply the companionship services exemption, it must

analyze each and every home that each of the plaintiffs provided services in, individually, in order to determine whether or not it is a private home.  Additionally, the parties will be required to conduct additional discovery to determine the specific factual circumstance surrounding each and every home and the consumer(s) who resided therein.  CRF claims that this type of highly individualized, fact-specific discovery and analysis eliminates the judicial economy that a collective action is intended to foster and, thus, decertification is appropriate.

CRF further argues that the limited discovery that has already been obtained indicates that differences exist among the homes in which the plaintiffs provided services that may impact the application of the individualized factors set forth in Bios.  CRF claims that the evidence already indicates that the Bios factors will be different for the various homes in question.   In particular, difference amongst the homes in this case have been illuminated with regard to the ownership or lease arrangement, and whether the provider maintains part of the residence for its own business use.  CRF notes that while all of the homes in this case were under lease arrangement, the leases differed significantly.  Some were signed only by the consumer or guardian as the tenant; others indicated the consumers name as tenant, but had no signature; others indicated the consumers' names as tenant, but had CRF's signature; and still others indicated that CRF was the tenant.  Similarly, according to the plaintiffs, some homes may have had areas set aside for CRF use, whole others may not have.  CRF maintains that these differences will not ultimately be determinative because similarities between the homes and the individualized analysis of each home should result in a finding that each home was indeed a private home.  CRF claims that, nonetheless, what matters at this stage is that differences do exist between the homes such that the private home analysis must be applied to each home

individually, and theoretically could impact the ultimate determination of whether a particular home is a private home or not, resulting in different application of the companionship services exemption across different employees.  CRF concludes that the highly individualized, fact-specific inquires necessary to make the private home determination should result in the decertification of this collective action.

CRF further argues that a second and more detailed layer of highly individualized, fact-specific inquiry is also necessary to apply the companionship services exemption in this case -- determining the amounts of time each plaintiff spent on general household work.  DOL regulations define companionship services as follows:

> As used in section 13(a)(15) . . . the term companionship services shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs.  Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services.  They may also include the performance of general household work; Provided, however, that such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. . . .

29 C.F.R. § 552.6 (emphasis added).

CRF maintains that the clear and unambiguous language of the statute and regulations delineating the companionship services exemption is intended to apply to employees like the plaintiffs, Direct care Staff of CRF.  CRF argues that it cannot be denied that the plaintiffs provided fellowship, care and protection to CRF's clients who cannot care for their own needs due to advanced mental or physical infirmity.  All Direct Care Staff work was related to the care and habilitation of the consumes, and there were not any tasks of the job that did not relate to the individual care of the consumers.  CRF claims that this fact is further corroborated by the state

regulations governing CRF's operations, the CRF job description for Direct Care Staff, and plaintiffs' own testimony.

However, the statute and regulations still contemplate, and require, an individualized analysis to determine the exemption's application to each plaintiff.  The regulation provides that an employee will not qualify as exempt if he/she spends more than twenty percent of his/her working time engaged in the performance of general household duties.  CRF does not deny that general household duties were part of the overall services that each plaintiff provided to CRF's consumers.  However, CRF claims that like the analysis under the exemption in <u>Reich</u>, a highly individualized inquiry will be required to determine exactly what general household duties any particular plaintiff performed, and how much of each individual plaintiff's time such duties absorbed.

Thus, CRF concludes that the application of the companionship services exemption will require extensive discovery efforts as to <u>each</u> particular employee and that the level of extensive highly individualized discovery and analysis that is required may be greater than the level required by the exemption in <u>Reich</u>.  CRF notes that the plaintiffs' own testimony has confirmed that there are at least five significant areas in which differences in individual plaintiffs would vary, which necessarily would have impacted the time each plaintiff spent in the performance of incidental general household duties without the consumers: (1) consumers' degree of mental challenge; (2) the number of consumers served; (3) the shift worked; (4) co-workers; and (5) the size of homes.

CRF first reiterates that the consumers had varying degrees of mental challenge.  The duties or services that any particular Direct Care Staff member performed with or for the

17

consumers they served varied depending upon the degree of mental challenge of the consumer.

Second, CRF notes that Direct Care Staff duties also differed depending on the number of

consumers living in a particular home.  Third, CRF notes that different plaintiffs worked on

different shifts, day shift or night shift, and some may have worked both shifts at various times.

As discussed earlier, the duties of Direct Care Staff were different on the day shift and the night

shift.   Fourth, the services performed by particular plaintiffs would vary depending on if they

worked with a co-worker who could share the shift duties and how the co-workers chose to

divide the duties.

Finally, the fifth factor resulting in differences in the duties between particular plaintiffs

is the size of the home at which the services were provided.  Not only did different homes have

different numbers of consumers, but different homes also had different physical sizes.  Duties of

particular plaintiffs differed depending on the size of the home they worked at, primarily

resulting in different percentages of time required for cleaning different homes.

The differences resulting from the five factor above, are further complicated by the

variances in the actual number of consumers each plaintiff provided services to (ranging from

two to twenty-one), the number of co-workers each plaintiff worked with (ranging from two to

twenty-seven), and the number of homes in which each plaintiff provided services (ranging from

one to eleven).  In order to determine the amount of incidental general household work

performed, highly individualized, fact-specific analysis will need to be undertaken for each of

the sixty plaintiffs, based upon the five factors noted above and as many as twenty-one

consumers, twenty-seven co-workers and eleven homes per plaintiff.  CRF contends that this

certainly destroys the judicial economy intended to be gained in FLSA collective actions, as

discussed in <u>Reich</u>, and should result in decertification.

 CRF argues that the need to undertake this highly individualized analysis is confirmed based upon the fact that some of the plaintiffs have already offered differing estimates with regard to the amount of time they spent doing general household duties with or without consumers.[5]  The indication being that some plaintiffs, by their own estimates, may fall under the companionship services exemption, but still others may maintain that they spent more than twenty percent of their time worked doing incidental general household work removing them from the exemption.  CRF claims that this is but one more layer of extensive individualized discovery that needs to be undertaken for each consumer, each home and each employee, which this court can and should avoid under <u>Reich</u>.

 The plaintiffs have objected to the motion to decertify and argue that decertification based on the analysis in <u>Reich</u> is premature..  The plaintiffs claim that they all had the same job descriptions, and were responsible for ensuring the completion of the same duties throughout any given week they worked.  The plaintiffs further claim that they all had substantially similar work sites.

 The plaintiffs state that the application of the CRF's claimed exemption depends first upon whether the plaintiffs were working at locations representing "private homes".  The plaintiffs argue that until the living units' status is determined, consideration of the possible need for any further inquiry into each of the plaintiff's individual specific day to day activities is premature.  The plaintiffs contend that any unit that is not a private home for the purposes of the

---

[5] CRF notes, however, that it does not concede that plaintiffs' own estimates will govern and that, should this action move forward, additional discovery will need to be obtained to ensure that only appropriate types of activity are included in plaintiffs' estimates.

companionship services exemption will never require an analysis of the individual plaintiff's daily breakdown of activities, since the exemption cannot apply to employees that did not work in "private home" settings.

The plaintiffs further argue that the determination of the status of the units they worked at does not justify decertification of their case.  The plaintiffs maintain that a review of the living units the plaintiffs worked at to determine their status is a simpler analysis, not centered on the breakdown of specific activities the individual plaintiffs engaged in on a daily basis, but rather a review that focuses on the units in which the employees worked.  The plaintiffs argue that cases other than <u>Bios</u> which involved the companionship services exemption have used a slightly different analysis of the living arrangements at issue.  See <u>Madison v.  Resources for Human Development</u>, 233 F.3d 175 (3rd Cir.  2000).  The plaintiffs claim that, regardless of the analysis used, the need for a "case by case" or "unit by unit" analysis in and of itself does not prevent residential care employees from proceeding with collective actions.

The plaintiffs point out that in <u>Bios</u>, the Court was faced with an action in which fourteen employees of a defendant employer provided services to developmentally disabled individuals in a variety of living arrangements.  353 F.3d at 1215.  The Court never addressed the issue of decertification of the collective action in that case; rather it addressed the lower court's ruling that, as a matter of law, the employer was not entitled to the companionship services exemption to the FLSA's overtime payment rules.  <u>Id</u>.  at 1215, 1220-1221.  In <u>Bios</u>, the lower court had granted summary judgment to the employees after analyzing their various work sites as a group, and concluded that they were not private homes.  The Court  held that a unit by unit analysis was required.  <u>Id</u>.  at 1221.

The plaintiffs claim that the <u>Bios</u> employees' ability to proceed at that point as a collective group was not destroyed by the nature of the need for a unit-by-unit analysis of the employees' work sites. <u>Id</u>.  The plaintiffs argue that, like in <u>Bios</u>, a determination of the status of the units plaintiffs worked in is the appropriate step to take at this time, and should not prompt decertification.  The plaintiffs further claim that the discovery to date strongly supports the position that each unit the plaintiffs worked at was being operated and managed by the defendants following the same key policies, procedures and practices, regardless of the unit reviewed, thereby providing the same result when reviewed on a unit by unit basis.

In reply, CRF reiterates that the highly individualized, fact-sensitive analysis that is required in this case under the application of the companionship exemption is two-fold: (1) whether the living units in which each of CRF's consumers received services were "private homes", and if so, (2) whether each of the plaintiffs' actual duties fell within the exemption. CRF notes that the plaintiffs' response makes no argument with regard to the highly individualized, fact-specific analysis necessary to determine whether each plaintiff's actual duties fell within the exemption, but focus solely on the issue of "private home".  CRF points out that the plaintiffs' argument ignores the analysis that is likely to follow the "private home" determination, which plaintiffs apparently concede will involve highly individualized, fact-sensitive discovery and analysis sufficient to decertify this case.  With respect to the plaintiffs' argument that the discovery and analysis required to make the "private home" determination is low enough for the case to continue as a collective action, CRF argues that the plaintiffs are incorrect due to the number of homes and consumers that must be analyzed regarding the "private home" issue.

CRF claims that the unit by unit analysis is not limited to each home or facility at which CRF provided services, but rather to each consumer to whom CRF provided services.  See Bios, 353 F.3d at 1218 (indicating unit by unit analysis required for each client living unit, consisting of the client's bedroom and the common areas to which the client has access).  CRF maintains that limited discovery obtained from 43 of the 60 opt-in members and plaintiffs in this action indicates that each plaintiff provided services in as many as eleven homes, implicating at least 34 consumers.  CRF concludes that the individualized analysis required regarding the "private home" issue must be undertaken for at least 34 consumers and, furthermore, to determine whether each unit was a private home, extensive discovery and analysis will be required regarding each consumer's living unit.

CRF further argues that the plaintiffs have mischaracterized the procedural circumstances in Bios and Madison.  CRF points out that at the time of the decision in the Bios case it was not even a collective action, rather it was a case involving fourteen individually named plaintiffs. Madison was a collective action but, as in Bios, did not involve certification or decertification issues.  Rather both opinions were decisions on motions for summary judgment, in which the defendants bore the burden of proof to demonstrate the companionship services exemption applied.  See Bios, 353 F.3d at 1217-18; Madison, 233 F.3d at 180-81.

CRF argues that, in contrast to the summary judgment stage, at the decertification stage the plaintiffs bear the "stringent" burden of demonstrating that the case should move forward as a collective action by showing that the plaintiffs and opt-in members did not have disparate factual employment settings, that individualized inquiries are not required regarding CRF's affirmative defenses, and fairness and procedural concerns are in favor of the collective action.

See Mielke v. Laidlaw, 313 F. Supp.2d 759, 762 (N.D. Ill. 2004).

CRF further contends that while Bios and other "private home" cases should guide this court with regard to how the "private home" determination should be made, it cannot be denied that the decertification standard for this court is a function of the Seventh Circuit's case law development with regard to the management of FLSA collective actions, which differs from the standards set forth in other circuits. CRF notes that the plaintiffs assume that decertification would have been addressed in Bios and Madison, and that similar standards would apply if it had been addressed. However, nothing in either of those cases suggests that decertification was raised on the grounds sought here.

CRF continues to maintain that much additional highly individualized fact-specific discovery and analysis will be necessary, should this matter be permitted to go forward as a collective action, both respect to whether each of the consumers' living units was a "private home" and regarding the level of incidental general household work performed by each of the plaintiffs.

CRF argues that the vast majority of the factual description in the plaintiffs' response is focused on making blanket analysis of the plaintiff's duties, CRF's consumers' circumstances and consumers' homes based upon CRF's policies and procedures. CRF contends that the plaintiffs' reliance on these policies and procedures is misplaced for at least two reasons. First, actual facts govern the relevant analysis, not mere policies and procedures. 'Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions." Forney v. TTX Co., 2006 WL 1030194 (N.D. Ill. April 17, 2006)(citing Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 400 (6th Cir. 2004). Job

descriptions and other policies and procedures, while they may be evidence of duties or potential facts demonstrating similarities, cannot replace discovery of those actual facts.  CRF argues that the plaintiffs cannot avoid the necessity to discovery and analyze the actual evidence of the facts and circumstances relevant to the "private home" analysis and the plaintiffs' actual duties by simple reliance upon policies and procedures which may or may not have actually applied to each consumer and each plaintiffs' circumstances.

CRF argues that the second reason that the plaintiffs' reliance upon CRF's Policies and Procedures is misplaced is that the policies and procedures are, to an extent, inapplicable and not an accurate reflection of CRF First Choice, Inc.'s operations.[6]  According to CRF, its policies and procedures were adopted based upon the policies and procedures of its predecessor company, former defendant, Residential CRF, Inc.  with little change.  CRF notes that while the policies set forth general concepts that are applicable to both CRF First Choice, Inc.  and Residential CRF, Inc., there are substantial differences between Residential CRF, Inc.  and CRF First Choice, Inc. which make for notable differences in the specific application of the policies and procedures.  In particular, Residential CRF, Inc.  operated facilities that were primarily "group homes," and in some circumstances, owned by Residential CRF, Inc.  However, CRF First Choice, Inc.  only operated "Medicaid-Waiver Homes," which were not owned by CRF First Choice, Inc.  and were considered the homes of the consumers to whom the services were

---

[6]  CRF notes that the U.S. Supreme Court very recently stated that "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."  Garcetti v.  Ceballos, 2006 WL 1458026 at *10 (U.S. May 30, 2006).

provided, housing as few as one consumer and as many as three consumers.

CRF states that it is notable that the policies and procedures discuss both CRF First Choice and Residential CRF types of facilities.  CRF argues that given that the policies and procedures discuss both Residential CRF and CRF First Choice facilities, it is to be expected that certain statements may imply different types of ownership or control therein, as the two entities operated different levels of ownership or control at their various facilities.  CRF concludes that, in any event, the reality of the questionable applicability of statements within the policy and procedures only further highlights the need for additional individualized discovery to determine the actual relevant facts in this case.

This court agrees with CRF that this case should be decertified.  The discovery and analysis to date has overwhelmingly shown that the further discovery and analysis that would be required to determine whether the companionship services exemption applies renders a collective action completely unworkable.  The purpose of a collective action is to economize and simplify the individual actions, and that purpose would not be served in the present case because each plaintiff's work situation would still have to be extensively analyzed after considerable additional discovery had taken place.  It seems likely that some of the homes (if not most) would qualify as "private homes" and thus a bifurcation of the analysis (as suggested by the plaintiffs) would not serve any real purpose in the long run.   Accordingly the defendant's motion to decertify will be granted.

<u>Conclusion</u>

Based on the foregoing, the defendant's "Motion to Decertify the Collective Action" is hereby GRANTED.

Entered: July 21, 2006.

s/ William C.  Lee
William C. Lee, Judge
United States District Court
